The next case, United States Department of Transportation v. CMCEng Mr. Pashinski? No, I'm Mr. Scarborough. Mr. Scarborough, I'm the Department of Justice for the United States. The court granted special leave for amicus to appear at the oral argument, and we appreciate that. This case involves allegations that various defendants violated the False Claims Act by falsifying their credentials and bribing officials at the Pennsylvania Department of Transportation in order to obtain federal highway funds. The District Court held that the complaint failed to state a claim under the False Claims Act because it believed that the false claims submitted to the PennDOT had no economic impact on the federal government, even though it's undisputed in this case that 80 percent of the funding on these projects that are at issue comes from the federal government. The District Court based this holding on its belief that the Federal Highway Administration, which provides these funds, provides them to PennDOT in a block grant rather than reimbursing PennDOT after contractors submit claims to PennDOT. What happens if the funding is already made, isn't it? The federal government has given PennDOT X number of dollars, and then a claim is submitted to PennDOT. No, Your Honor, that's the misapprehension that the District Court was operating under. The funds under the scheme, and I've gone to great lengths to sort of understand this with our federal highway program people, the scheme obligates certain funds. Funds are sort of allocated out to various states, and then projects are sort of certified and funds are obligated. There's a pool created. No money actually changes hands to the PennDOT at that point, but PennDOT essentially has sort of a line of credit that they can draw upon at that point. Then when claims are submitted by contractors on those projects to PennDOT, PennDOT turns around and submits electronic requests for reimbursement to the Federal Highway Administration on a weekly or monthly basis, and in those electronic requests for payments, certifies that all applicable state and federal laws. So the federal government gets to review each of those claims presented? Well, I don't mean to overstate the level of review that the federal government. Obviously, there's thousands of claims submitted in sort of bulk packaging, but there is a general certification made by PennDOT that applicable state and federal laws are being complied with. Certainly, you know, prohibitions against bribery, conflict of interest, those sorts of things, the kinds of violations that are alleged in the complaint. All right. So the state agency has rules that it applies and determines whether the claim is legitimate or not? Well, they're not just state agency rules. They're also federal rules. The federal government obviously is not going to reimburse contractors or reimburse the states. All right. But the state government's in the captain's chair as far as the claims are concerned? As an initial matter, yes, Your Honor. But the state does turn around and pass the claims back on up the chain to the federal government, and that's what Allison Engine, we now know, requires. Does the federal government engage any review process of the claims? Well, again, it's difficult to say as a categorical matter that, you know, the federal government goes over these with a fine-toothed comb, but there is auditing periodically, and it's one of these situations where when you begin to see problems, the auditing becomes more serious. You look at the claims more closely. But at any rate, the funds are not released from the federal government until the claim is presented? That's correct. And that's why we say that as a factual matter, this case states a claim under the Allison Engine standards in the sense that the claims are submitted from PennDOT to the federal government. They are requesting payment or approval of the claim as, you know, the Allison Engine case now, as explained, requires. Let me just ask you a question about the federal government's position on this case. And I understand the Federal Claims Act statute, but at first you indicated that some entity of the federal government, I don't know if it was your division or not, said you were not going to intervene in the case. You then submitted two statements of interest. The second statement of interest finally clarified the funding stream. Explained the situation. Explained. But in that statement of interest, you said you take no position on the case as to how the case was disposed of by the district court. You took no position on the merits of the motion that was before the district court. Well, and that's sort of standard in a decline in companion case. Okay, that's standard. Okay, now you're here as an amicus. You're here as an amicus. Has your position on this case changed since the Supreme Court's decision in Allison Engine? Well, I mean, the first part of the argument in our green brief that we filed with this court has been superseded by Allison Engine. Allison Engine, we lost in the Supreme Court. We lost it. Our initial position was that the timing of the way the funds are distributed should matter. Now, you're arguing much more vigorously than what the federal government was doing with this case when it was before Judge Lancaster. Well, let me explain. I guess I'm asking you to explain why. Sure, I will explain why, because Allison Engine is an important decision, and clarifying the standards by which you can continue to have False Claims Act liability in situations where there is a federal grantee, the state transportation agencies here administering federal funds, is a very important issue to the federal government post-Allison Engine. And the most important thing about this case is that as a factual matter, the Federal Highway Funding Scheme operates in a way that you can make sufficient allegations that a defendant who bribes that entity or submits false credentials to that entity intends to get a false claim paid or approved by the government as required by Allison Engine. But doesn't it make it harder? I'm not sure that it does make it harder, Your Honor, where the normal operation of the scheme is that the gatekeeper to the federal government funds, the pen dots of the world, turns around and submits the claims to the federal government. That's what the Supreme Court was concerned with in Allison Engine, that there be some sort of passing the claim forward. And what the Supreme Court was concerned with there is limiting the False Claims Act liability of the initial person dealing with the pen dots of the world to the natural, ordinary, and probable consequences of its fraud. Now, in a program that is undisputed, where 80% of the money comes from the federal government, and the normal operation of the program is that pen dot turns around and electronically goes to the federal government and says, give me money, it's sort of the natural, ordinary, and probable consequences, or yes, you can be on the hook when you commit fraud that the government cares about, obviously bribing. Does it matter that the parties involved in Allison were private individuals as opposed to here, where it's a government agency? No, I don't think so at all. No consequence whatsoever. No consequence whatsoever. What matters is, and what the Supreme Court was concerned about, is the person who is unwittingly dealing with an entity that gets some amount of money from the federal government. See, there are a lot of people standing in line, and far more today than there were three months ago, saying, give me money. Okay, and the federal government is handing out a lot more money today than they were three or four months ago. Absolutely, Your Honor. Okay, but the issue here is whether or not when Congress passed the False Claims Act, they intended grantees of the federal government under circumstances such as this to be able to use the False Claims Act. That's really the issue here. Absolutely, that is the issue, and that's why we're here, because this sort of funding issue, the way the funding mechanism works at the back end has become a much more critical issue after Allison Engen, and we want to make sure that the Court, whether it affirms or reverses in this particular case based on the pleadings, what we want to make sure is the Court doesn't say anything categorical about it. Does this case, does the Supreme Court decision in Allison Engen, which obviously came after Judge Lancaster's decision in Arnold, does that decision in and of itself require us to send this case back to have the District Court analyze the motion to dismiss under the Allison Engen analysis? I think that would be the preferable result, Your Honor. Does Allison Engen require that? I'm not sure that Allison Engen requires that. It's notable that the Supreme Court in Allison Engen did remand for further proceedings consistent with its opinion. I mean, there was Allison Engen in the Sixth Circuit. There was the Totten case in the D.C. Circuit. There was a circuit split. It's been a state of confusion, basically, on how much you have to allege, you know, how the federal funds are distributed to the federal grantee. There's been a big dispute in the circuits, a lot of litigation about that. So I think the preferable course, yes, now that we know what Allison Engen requires to be alleged would be to send this case back. I'm sure you're going to hear from defense counsel that that's, you know, the third, fourth, or fifth bite of the apple. However, there is significant intervening case law, and, you know, to some extent it seems justified to send it back and sort of have a clean slate. What we care about and why we're here and, you know, wanted to participate in the argument is that a message from affirming this case might be as, well, because of the way the funding scheme works in the federal highway funding situation, you know, you can defraud the pen dots of the world with impunity without facing False Claims Act liability. That is simply not right, even under Allison Engen, because there is a representment of claims to the government. And we want to make absolutely clear the Court understands that's the way the funding scheme works. So, Mr. Scarborough, when the Supreme Court says that a plaintiff must prove that the defendant intended that the false statement be material to the government's decision to pay the claim, when Judge Lancaster says the statement has to be presented to the federal government, this decision says pen dot is okay if the intent is that the federal government pay the claim? I'm sorry, pen dot is not. Well, Judge Lancaster said that the claim has to be presented directly to the federal government. Well, that's my understanding. I think he was focused on the economic impact of the federal government. And his theory of the case, if I may be so bold, was that, well, the funds here have already been given in a block grant. And that's why we said in our statement of interest below and again here, that's not right. They've been obligated, but they haven't been given. His view is that the money had already been paid? I think that was his view. That seemed to be his view. And that's not the way the scheme operated. And you can tell that he was resisting, you know, the government coming in. He was basically saying, you know, accusing the government of coming in too late with this information. So, if the payment had not already been made, it would have been all right to make the presentment of the claim to pen dot? I didn't follow that. Well, you said that Judge Lancaster ruled the way he did because the federal government's payment had already been made. That was his misapprehension of the scheme. And my question was, if it had not already been paid, it would have been okay to present the false claim to Pennsylvania Department of Transportation. That? Allison Engine makes it difficult to pursue claims of fraud in cases such as Totten itself, where there has been a block grant allotment of the federal money. And Allison Engine makes clear that there's a difference between a false claim submitted to someone who's going to distribute federal funds and a false claim in which there's going to be a claim presented to the government. And what we're trying to make clear is this is the latter case. This is a case in which, you know, under the normal operation of the scheme, the pen dot turns around and submits the claim. So presenting the claim, the false claim to Pennsylvania Department of Transportation in itself is not a problem. Well, what Allison Engine makes clear is whether it is actionable under the False Claims Act depends upon whether that claim is passed through to the federal government or not. And our point is, in this case, it is. There's a sufficient factual basis for making those allegations, and that's why we think the case should be sent back so those allegations can properly be made. Thank you, Your Honor. Mr. Scarborough, thank you very much. Thank you. Mr. Praczynski. Mr. Praczynski, not to preempt what you were going to say, but to follow up with where Mr. Scarborough was. Isn't the real problem with this case the fact that at the time Judge Lancaster ruled the complaint, the second amended complaint, in other words, the third crack at this that was before him, still had not adequately explained the funding stream? That certainly should, Your Honor. Isn't that the real crux of this case? I don't think it's the crux of the case. I think it was the crux of the case for Judge Lancaster. Isn't that all we really have before us is whether or not Judge Lancaster was correct when he granted the motion to dismiss? Well, yes, you do have that, but the complaint was sufficient, first of all. Second of all, we do have the- Okay, go to that. How was the complaint sufficient? I mean, it seems to be very clear to me that the second amended complaint, in other words, the third try- Correct. from first amended complaint to second amended complaint. It still did not contain the information that you subsequently had produced for you under the second statement of interest filed by the federal government. As a preliminary matter, I cannot emphasize how difficult it was in this case to try to track down and nail down the exact mechanism by which funding proceeded. I'm not sure I understand that. I can't understand that from that record and from the point of historical perspective on a personal level. This isn't a really complicated issue. You made it complicated in this case. The funding was complicated, and we had filed numerous right-to-know requests, FOIA requests, to try to get the details on how exactly the funding stream worked. And we, at some point, were getting different information. And what we were pleading- From the federal government? And we were having trouble with where to send the FOIA request to the federal government, because they were bouncing, telling us we'd send it one place, and they would say, this isn't the right agency. It's got to go someplace else. I mean, your client, Mr. Arnold, worked for PENDA. He worked for PENDA, but he did not track the funding and the way the money flowed. I have a hard time. I have a hard time understanding that. I think you understand why I have a hard time understanding that. But, I mean, the- But, Allison- I want to focus this case back to where it is. Okay. This is a review of a decision on a motion to dismiss. Great. And the crux of this may come down to whether or not Judge Lancaster abused his discretion in denying you the right to amend the complaint a third time. And if we focus on Judge Lancaster's decision, then we must also focus on his deviation from the controlling standard of review on a motion to dismiss. Because on the motion to dismiss, as long as there were factual allegations concerning the essential elements of each claim, the complaint should not have been dismissed. Are you content with the current second amended complaint? I would prefer to amend it again, especially after Allison Engine emphasized, as Your Honor was asking Mr. Scarborough, the importance of the intent to defraud, which was first announced by the Supreme Court as an element of an A2 claim in the Allison Engine Company. Judge Lancaster did not have the benefit of that, so I think a remand would be necessary as a result of Allison Engine. But if I can go back to the standard of review, Judge Lancaster's decision expressly states that he was dismissing because Mr. Arnold failed to establish certain facts. And Judge Lancaster, if you review his opinion closely, viewed this as a presentment case. But what facts did he fail to establish? Well, what Judge Lancaster said he failed to establish was that there was, failed to establish that there was presentment or that there was a false statement made to get a false claim approved or paid. And that is just, he didn't have to establish that. He had to allege it. And if we look at the complaint, the complaint includes sufficient allegations of the necessary elements. For example, each of the appellees are identified with contract numbers in which fraudulent and falsely inflated qualifications for inspectors and consultants were submitted, which leads to higher bills. So we have the exact contracts. Mr. Arnold had performed a review of his own, which included five of the nine appellees. And he identified where the fraud took place, where the false claims took place. Secondly. But Judge Lancaster didn't really get into the merits of the contentions, did he? I'm sorry? He dismissed this, it was a 12B6? Correct. Sufficiency of the complaint? Right. He never really got into whether the accusations were true or false, did he? Except that he said that he failed to establish it, which explicitly means he didn't prove it occurred. But he didn't have to prove it occurred. So in addition to alleging that there was the fraud, the complaint specifically alleges that false statements were made with the specific intent to defraud the United States and to obtain federal funds. So even under the Allison engine, additional component of intent, that intent is pleaded in the second amended complaint. Do those allegations sufficiently support the pleading of a re-presentment to the federal government? Well, it's not the re-presentment, it's the intent. That specifically beats the element of intent. Did you have to include who, what? I'm sorry? Who, what, when, and where? No, under this court's precedent under 9J, all we had to allege was a description of the nature and subject of the alleged misrepresentations. And that we did. We alleged that the appellees were submitting falsely inflated qualifications in order to defraud the government by being able to submit higher bills. And we also alleged that there were certain PENDOT officials who were acquiescing to this scheme because they were the recipients of inappropriate gifts and bribes from various appellees that they were in on the scheme. So these are things that are alleged in the second amended complaint. But I would also maintain that the second amended complaint does include an allegation of presentment. And that would appear in various paragraphs. If you look at paragraphs 56, 66, 76, 84, and others, where it is alleged that the federal government did have to come in and make a review of the data or the project before a final payment was made. And on page 31 of our initial brief, we cite to a manual in which it specifically states that it's a federal manual, that a final review by the federal government was required before final payment was made. Mr. Brzezinski, your red light is on. I have reserved one minute for rebuttal, Your Honor. Thank you very much. Good morning, Your Honor. Mr. Grail, good morning. I have nine minutes. Mr. Ebkin, my co-counsel, will address the issue of the original source. And if necessary, Mr. Holland will join him. He will try and pay homage to and do justice to the Rule 28 rule to split up the time appropriately. I must say I am joined in the government's desire to clarify the standards of what must be shown under Allison Engine. And I am, in fact, surprised that he has only stated half of what the holding of that case is. Allison Engine does not require remand, and let's talk about why. Allison Engine, in its first paragraph of the holding, talked about the intent of the maker of the statement. But if you read on in the opinion, what Allison Engine really goes to is causation. It shows that the false statement must have an impact on the federal government's decision to pay. There must be a causal link. It requires a nexus, if you will. The issue of presentment or re-presentment, whether it's through a state agency such as PENDOT, or the type of independent quasi-governmental agency such as Amtrak, or even a private contractor such as in the Allison Engine case, as long as the claim gets to the federal government at some point, we don't quarrel with the application of the False Claim Act. Doesn't the presentment of a claim trigger payment? The presentment of the claim under Allison Engine is just the first part. If what the defendant, sorry, what the relator has to allege, in order to make out a False Claims Act allegation, is that the alleged false or fraudulent statement is made, quote,  And I can direct the court exactly to that language. In the opinion just above the, just below capital letter C in that opinion, it says, that if a subcontractor or another defendant makes a false statement to a private entity and does not intend the government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim by the government, the federal government. In such a situation, the direct link between the false statement and the government, that is the federal government's decision to pay or approve a false claim, is too attenuated to establish liability. And what Mr. Scarborough did not address was that regardless of when the claim gets to the government, whether it's after, as Judge Lancaster wrote, or now, not the fourth or the fifth bite of the apple, as the government and relator took in their appellate briefs, but now even today, Mr. Scarborough's coming with additional allegations. This is the first time we've heard of a general certification by PennDOT in its, quote, electronic request to reimbursement that they pled for the first time in their second brief to this court on page 14. We've never heard that about a general certification by PennDOT. It still doesn't go to the fact that they haven't alleged in their first complaint, in their first amended complaint, in their second amended complaint, in all the briefs they filed and what Mr. Scarborough has gotten up here today and said, that any of the alleged false or fraudulent statements by the appellees were in any way communicated, let alone caused the payment, caused the federal government to get the claim paid. Are you suggesting that the government has to know that the claim is false? I'm suggesting that the government has to know whatever the statement is that the relator alleges is false. The government has to know that the statement that the relator makes is false? Perhaps I didn't state that correctly. I think that's what you just said. What the government has to know is the statement, whatever statement it is that the relator alleges is false. The federal government, at the time it makes its payment on the claim, has to be aware of that statement. All right. Aware of the statement. But obviously, if the government knows it's false, it's not going to make the payment. Obviously. And I didn't mean to infer that. And if I went that far, I apologize. Right. What the case really says is that it's an implied certification case. Here, in this case, what they allege, not that work wasn't done or wasn't done appropriately, but that some of the people who did it, and we're going back now prior to September of 2000. Some of the people, they were not properly certified to do the job that they claimed they did. And so that's a misrepresentation. It's a violation of a right. That's what the relator is saying in this case. That is what they say is the claim that is being filed that the government paid. And that's wrong. Why isn't that sufficient under Allison? It's not sufficient under Allison because they never allege, except in paragraph 47, which the district court deals with in footnote three, and I think we've all read that, and I think the court was rightfully suspect of the disingenuousness of relator, where they took out the word by extension. Representation to PennDOT and, by extension, U.S. DOT in the first amended complaint. By the time we get to the second amended complaint, they take out the troublesome word by extension. That's the only point in their complaint that comes close to alleging the logic, the required causal link, the nexus. What Mr. Scarborough then. Mr. Gryll, as to the, you'll agree, will you not, that the district court, when the district court analyzed, ruled on the motion, assumed for purposes of their decision that PennDOT had received the money in a lump sum? I would concede that the district court believed that. Okay. In light of Allison Engine, isn't the fact that the district court believed that, whether you want to say they believed it based on the three complaints, the second amended complaint in front of them, or whether they misinterpreted what was in front of them, under Allison Engine, isn't that enough to send this matter back for the court to reevaluate the complaint based on the Allison Engine decision? Your Honor, I don't believe that. The timing is almost irrelevant based on what they've alleged in their three complaints, two briefs, and now their statement before this court. Let me direct the court to a decision that was handed down on December 18th in the Fifth Circuit. I cited the district court opinion below in my materials. It's called Rafizadeh. The case just became available, I understand, electronically in Westlaw over the weekend. It was a very similar case where the underlying district court opinion was made on presentment grounds, and with the benefit of the Allison Engine case, the Fifth Circuit looked at the complaint and said, wait a minute, we're not going to send this back. We're not going to waste the district court's time, because based on all of the allegations they've made in the number of different complaints before the court in that case, it would be futile. It would be futile because of two things. Number one, 9B, and all the issues, Judge Fuentes, you have those in mind, the time, the place, the manner. Despite his 37 years of working for PennDOT, despite all the experience with the government and the time they put into this from 2000 or 2001 when he conducted what he says were his audits, 2003 when he files the claim, 25 months of investigation by the government while the complaint is under seal. The three different iterations of the complaint that were filed. He never makes a motion, by the way, to the district court under Rule 7, under Rule 59, under Rule 60, as the McInteer case says he should have done, to ask for leave to amend. He's never asked for leave to amend. He's never asked to go back to the district court and amend this complaint. What Rafizadeh said was that 9B makes this court able to look at the complaint and say there is not a single false claim to any governmental agency, not the federal government, not PennDOT. There is not a single false claim that they alleged. All they allege is an elaborate violation of a regulatory scheme. They never point to a specific claim. And they admit that. They'll never be able to point to a specific claim. And this court should not make the district court go through that exercise. Did they not assert that they had filed claims for payments from individuals who were not properly credentialed to receive those payments? They made one bald, I think the cite from Anton, is one naked, bald assertion of fact that is really a legal conclusion. We may disagree with it. Isn't that, in essence, a false claim? Well, isn't the district court the entity with the best opportunity to judge? And wouldn't this court have to overrule the district court, reverse the district court on an issue purely abuse of discretion standard, not having anything to do with Allison Engine or later case law or the later amendment, the later additions that the government has made here? I think Mr. Kuczynski was saying that the court was holding the relator to a higher standard of proof requiring that they establish a point, not that they simply assert it as in the complaint. You know, I've read that opinion by Judge Lancaster. And all of the cases that Judge Lancaster cites in that opinion are pleading cases. And he uses the term established with reference to the pleading. I think he really, I think Mr. Kuczynski in his heart of hearts knows that Judge Lancaster has not converted this Rule 12b motion into a summary judgment motion under Rule 56. I think it's just the choice of the language. And I don't think this court should put too much credit in that. Good point to end on. Thank you very much. Thank you, Your Honor. Mr. Epkin? Good morning. May it please the Court. John Epkin on behalf of the Appleese. I'll devote my time to the original source argument, which is implicated where, as here, the lawsuit is based upon publicly disclosed information. And I won't belabor the public disclosure component of this jurisdictional test because appellant conceded at the district court level that this action is, in fact, based upon publicly disclosed information. Needless to say, this judicial admission is binding, not just at the district court level, but throughout the course of this appeal as well. So given that admission, subject matter exists over this lawsuit only if the appellant is an original source of the information that gives rise to his suit. Original source is statutorily defined as one who possesses direct and independent knowledge of the publicly disclosed information that gives rise to the suit. And in addition, the person with direct and independent knowledge must disclose that information to the government prior to filing suit. And so I'm going to focus on the first part of the original source test, which is direct knowledge. Direct knowledge is defined as knowledge marked by an absence of an intervening instrumentality or influence, and the information must be obtained by the relator's own efforts, not by the labors of others. So the problem that appellant has in this case is that he can't meet that definition, and the reason is that he never personally audited. Mr. Epkin, since the district court did not decide this case on that issue, is there enough in the record for us to decide this alternative argument? I would submit, Your Honor, that there is, and the reason is that Where would it be? Appellant attached to his First Amendment complaint as Exhibit A 216 pages of documents that he characterizes as the sum and substance of his personal audits. Not one line of those 216 pages even mentions Kimball and most of the other appellees before the court today, let alone their billing practices under the ad issue contract. And so the upshot is he concedes that he has no personal knowledge of any information having to do with Kimball and other appellees. And in recognition of that point, what he does is he suggests that the fact that he audited certain parties, in this case, caused PennDOT in turn to conduct separate audits of different parties, in this case. And beyond that, the appellant says that PennDOT's independent audits, in which the appellant admittedly played no role whatsoever, triggered certain of the appellees, including Kimball, to commission themselves independent audits. All of the information that the appellant has on Kimball is based upon the young oaks. The audit was in no way related or ordered or supervised or participated in by the appellant. And I think the short answer is there's no possible way that the appellant can have direct knowledge with respect to a party that he never audited or otherwise investigated. And I think there are several cases, mainly from outside the Third Circuit, that speak to this issue. I'll just briefly address a few of them. Advanced Sciences from the Tenth Circuit involves a relator who suspected fraud being perpetrated by a third party. The relator ordered his subordinates to conduct an audit of that third party, and then this relator subsequently reviewed the results of his subordinates' audit. When the relator filed suit against the third party that was audited, the Tenth Circuit found that even though he instigated the audit, supervised the results, and had it performed by his subordinates, the fact that he in no way personally participated in the audit meant that he could not possibly be an original source. And that's the Tenth Circuit. The Ninth Circuit reaches a similar result in CL1 versus CLA. In that case, the relator allegedly discovered fraud being perpetrated by Packard Bell against a computer. The scheme allegedly was that Packard Bell was selling used computers to the government at new computer prices. The government was, the relator disclosed that information to the government which provoked the government to investigate Packard Bell and other similar companies such as Zenith. So. To finish your point, Mr. Sharkey. Yeah, so long story short, when the relator sued Zenith, the Ninth Circuit held that even though the relator had direct knowledge of the exact same scheme perpetrated by Packard Bell, that did not give him direct knowledge with respect to another defendant, even though that defendant allegedly participated in the exact same scheme. Good. Mr. Epkin, thank you very much. Thank you. Mr. Holland. Good morning, your honors. May it please the court, Jonathan Holland on behalf of the Pelley CMC engineering and Erdman Anthony associates. When I dress up and you said judge Fisher, which is this issue of an additional ground for affirming the district court and its dismissal with respect to original source and whether there's enough in the record. And I think as Mr. Epkin said, all we have to do here is look at the complaint. The complaint talks about two kinds of audits. They talk about the Arnold audits, which are supposedly attached to the complaint.  comptroller's office. Most of the allegations in this complaint are based upon what the controller's office allegedly found or didn't find. So we hear a lot, even from the government about bribery and gift giving and things like that. But when you sit down and you look at these complaints, you'll find there's not a single allegation about bribery or gift giving with respect to CMC or Erdman Anthony. When you look at the 214 pages that are supposed to comprise the Arnold audits, you won't find a single page that relates to Erdman Anthony. In fact, when you look at the first amended complaint, you won't even see Erdman Anthony listed in the caption. It's just a John Doe. So it's pretty clear that the relator, Mr. Arnold can have absolutely no direct or independent knowledge with respect to Erdman Anthony. And we can just look at his complaint and see that there's nothing there with respect to it. With respect to my other client, CMC engineering, it's a little bit different. He references one contract that he says that he looked at with respect to CMC and he attaches something in his exhibit H, which is supposed to be a false claim. Now we've talked about what Allison engine requires in terms of false claim. And it's something that you are going to submit with the intention that the government would rely upon it and pay something that otherwise shouldn't pay. What is it that Mr. Arnold attaches to his complaint as the audit? It is at my supplemental appendix, AA2, and it's a memo from Mr. Arnold to his superior that says, Hey, there's a resume attached here of W. Stein three. Back in 2000, I told you that his relevant experience had showed up in other things and his resume is so vague that you cannot make a rudimentary evaluation. That's what he says. His resume is so vague. You can't make a rudimentary evaluation. That is not a false claim. That's not a misleading claim. What's interesting is we also have what he attaches as the audit from PENDOT with respect to CMC. That's also in the supplemental appendix. And when you look at pages A41, 42, we see what the PENDOT audit did with respect to Mr. Stein. They found absolutely nothing wrong with respect to Mr. Stein. So in the documents that are attached to the complaint, we see that there is not a single false claim alleged with respect to CMC, of which the plaintiff is the original source. And that's an alternative ground for this court to find. There's no jurisdiction and no reason to send this back for anything further. Thank you. Thank you, Mr. Holland. Mr. Paschinski. I have reserved one minute for rebuttal. Mr. Scarborough has asked me if it would be possible for a speech to have one minute. All right. One minute. We'll hold you to the one minute. Okay. Mr. Scarborough. The basis on which the district court decided the case is that there is no economic harm to the government because it believed this was a block grant scheme. There's no dispute that that's wrong. There should be a remand on that basis so the case can go back for Allison Engine. Mr. Grail got up and talked a lot about what is in essence a materiality type of thing. Would the government care about the false statements made to the gatekeeper of the federal funds? And the answer is, of course, absolutely. But that's not the basis on which the district court got rid of the case. That's an argument you would make at summary judgment. That's a later stage of the case. The case should go back for proper pleadings under the Allison Engine standard. Thank you, Mr. Chizky. Very quickly, I want to make one point with respect to the public disclosure argument that was made by Appellee's Council. Mr. Etkin pointed the court to cases from other jurisdictions. I would prefer that this court look at its own precedent in the case of U.S. XRL Dunleavy versus Delaware County in which this court specifically held that outside audits such as the one performed by PENDOT, unless they're performed by a federal agency, are not public disclosures under the meaning of the Federal False Claims Act statute. The Third Circuit's analysis and decision in Dunleavy was recently adopted by the Fourth Circuit in the Wilson case, which is cited in our reply brief. Do you think it's okay that we address the original source issue? I had initially argued in my reply brief that I think that any issue not addressed by the district court should be remanded to the district court initially, but since the appellees had briefed those issues, I felt compelled to present some argument. Finally, someone, I don't remember which judge, asked if this was an abuse of discretion issue for Judge Lancaster. The answer is no. Since it's a Rule 12 motion, this court conducts de novo review, is the appropriate standard of review here. Thank you. Mr. Fijinsky, wouldn't we be reviewing Judge Lancaster's decision not to allow you to amend your complaint? Yes, I apologize. Under an abuse of discretion standard. Yes, the dismissal is the de novo, the right to amend is an abuse of discretion. I apologize. Yes. Okay. And in the Atkinson case, this court addressed a false claims act case where the plaintiff relater was on his third amended complaint. Thank you. Thanks to all counsel for very well presented arguments. We'll take the case under advisement. Thank you. Thank you very much.